IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

*vs*.  **CRIMINAL ACTION NO. 1:08CR37**

**SEAN FABIAN,**
       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On June 16, 2008, Defendant Sean Fabian, through counsel David Frame, filed his "Pre-trial Motions" [Docket Entry 10], which include a motion to suppress; a motion for production of video and/or audio recordings, photographs or other evidence relating to the altercation that occurred prior to the search of the defendant, the search itself and/or any questioning or conversations between the defendant and the prison personnel before, during and after the search; and a motion for production of his prior PSR and the transcript of the sentencing hearing. On June 24, 2008, the United States, through David Godwin, its Assistant United States Attorney, filed its Response to Defendant's Pre-trial Motions [Docket Entry 13].

On July 24, 2008, Defendant appeared in person and with his counsel, David W. Frame, and the United States appeared by its Assistant United States Attorney Zelda E. Wesley for hearing on Defendant's pretrial motions. The Court heard the testimony of Kenneth Montgomery, Brian Antonelli, Michael Kocher, and Defendant, Sean Fabian, and heard the arguments of counsel.

## I. Procedural History

Defendant was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on May 6, 2008. The indictment charges the defendant with being an inmate in the custody of the Bureau of Prisons, in possession of a prohibited object, to wit, an object that was designed and intended to be used as a weapon, in violation of Title18 U.S.C. §§

1791(a)(2) and (b)(3) [Docket Entry 1].

Defendant had an Initial Appearance and Arraignment on May 21, 2008. An initial scheduling order was entered at that time, scheduling a June 20, 2008, hearing on all motions filed by the defendant and/or the government which were referred to the undersigned United States Magistrate Judge [Docket Entry 6].

Pursuant to the initial scheduling order, Defendant filed his pre-trial motions on June 16, 2008 [Docket Entry 10]. On June 19, 2008, United States District Judge Irene M. Keeley entered an order referring the motions to the undersigned United States Magistrate Judge for determination [Docket Entry 11]. Judge Keeley subsequently granted Defendant's Motion to Continue Trial on July 8, 2008, and the undersigned continued the hearing on Defendant's Pre-Trial Motions to July 24, 2008, at the request of Defendant.

## II.  Discovery Motions

For reasons apparent to the Court and as stated and ruled upon during the hearing, Defendant's motions regarding the production of video/audio recordings and regarding the production of his PSR and transcript of his sentencing hearing are both **DENIED AS MOOT**.

## III.  Motion to Suppress

### A Contentions of the Parties

Defendant contends that the evidence seized after a visual search of body surfaces and/or body cavities on March 13, 2008, must be suppressed on the following grounds:

1. There was no factual basis for a reasonable belief or suspicion that Defendant was in possession of contraband.

2. The BOP personnel who performed the search were not justified in requiring and/or

performing the search because Defendant was not a candidate for a visual search under 28 C.F.R. 552.11.

3. The BOP personnel did not have a legitimate factual basis on which to form a reasonable belief that contraband may be concealed on Defendant or that a good opportunity had occurred for contraband to be concealed on Defendant.

4. Defendant was singled out and searched, even after an initial pat down did not yield any contraband or reason for suspicion.

The United States contends:

1. Neither individualized suspicion nor probable cause is necessary for a visual cavity search.

2. The circumstances of the search in this case demonstrate that the search was reasonable.

3. The search was conducted in accord with 28 C.F.R. §552.11, and there was a sufficient factual basis on which to form a reasonable belief that contraband may be concealed on Defendant.

### III. Statement of Facts[1]

Defendant is an inmate of USP Hazleton. On March 13, 2008, Lt. Kenneth Montgomery, a member of the Bureau of Prisons staff at FCI Morgantown, was at USP Hazleton for training. While he was at Hazleton an alarm sounded, and he and other staff responded to the recreation yard. He was aware at the time only that there was a fight. He was about 100 yards away from the area of the fight when the alarm sounded. When he arrived at the scene, other staff members were already "pat-searching" inmates. Lt. Montgomery did not know at the time who had been involved in the

---

[1] The facts are derived from hearing notes and a review of the digital record (FTR) of the hearing held July 24, 2008. No transcript was available.

fight. The policy of the facility was to perform a pat-down search of all inmates on the yard when there was a fight, in order to identify inmates who were involved and/or injured and to locate weapons and other contraband, if any. Most of the time, staff responding to an alarm do not know what has actually occurred or who was involved. As a result, they pat-search everyone. Lt. Montgomery was not aware of anything suspicious being discovered in the pat down. He testified a pat search was non-intrusive; inmates did conceal contraband and weapons in places where a pat-down search would not reveal them; and inmates also would "drop" weapons.

The inmates stood for several minutes while they waited to leave one-at-a-time from the yard. As they left the yard, they were to be identified by SIA Brian Antonelli from his inmate roster. As SIA Antonelli was identifying the inmates as they left through the exit gate, Lt. Montgomery observed Defendant and five other inmates standing along the fence line. They had not been directed to stand there, but stood where they wanted, generally with members of their own "circle" or gang. Defendant and another unidentified inmate were standing with their backs to the fence, facing staff members including Lt. Montgomery. Four other inmates were standing in front of them. Lt. Montgomery perceived the four inmates in front to be forming a "barrier" between the staff and Defendant and the unidentified inmate. He was actually more suspicious of the unidentified inmate, who was acting nervous. Defendant was also acting suspiciously– making eye contact with him, looking at the ground, and having inmates form a barrier between him and the staff. Through his knowledge and experience Lt. Montgomery believed that Defendant and the unidentified inmate had arranged to have the inmates form the barrier. He had not heard any communications between them to that effect.

Lt. Montgomery continued to observe the six inmates, and notified another staff member to

4

pull four of them aside as they left and perform a visual search. Lt. Montgomery had no prior specific association with Defendant. Having determined the six inmates' behavior as suspicious, he decided they needed to be pulled aside and searched. He was in a position to make the decision, and did not need authorization or a consultation to do so. Lt. Montgomery testified that he had not asked SIA Antonelli anything, and Antonelli was not involved in his decision to separate the four inmates and perform a visual search. He had not had the inmates pulled off the yard immediately because there had been a fight and the inmates needed to exit individually and be identified. His main focus was on the two inmates who had been behind the others, but he also included two of the inmates who had been standing in front of them, as a precaution. He "just selected two" out of the four. There were possibly 50 inmates waiting to leave.

As the inmates exited, Lt. Montgomery separated Defendant and the unidentified inmate, along with two of the four "barrier" inmates, to be brought into the corridor. When the inmates went into the corridor, there was "a lot of confusion" in the corridor. Lt. Montgomery took each of the four inmates one-at-a-time to a secluded area for a search. The waiting inmates were observed by other staff. Lt. Montgomery performed the search of Defendant himself, alone, in an isolated area. He found a homemade weapon concealed in Defendant's crotch. He strip searched all four inmates he'd selected. He did not know if any other inmates were searched by other staff.

The facility also had a "BOSS" (body orifice security scan) chair. It was the facility's policy to perform a visual search rather than using the chair, except when inmates were coming from outside the facility. The priority of searches was: 1) visual or strip search; 2) BOSS chair search; and 3) invasive body cavity search. During the visual search, the inmate would be instructed to open his mouth, lift his tongue, hold his ears away from his head, raise his arms, and raise his testicles, while

5

the staff member observed. There was no physical contact. During the visual search of Defendant, Lt. Montgomery observed a white string loop hanging from the area of Defendant's testicles. Defendant turned around "in an effort to discard" the object. Lt. Montgomery ordered him to turn back around and throw the object on the floor. Defendant complied. The "object' was a seven inch metal rod, similar to an ice pick, with white string forming a lanyard to hold the object on the wrist.

Lt. Montgomery had not seen any weapons in the yard and had not seen any staff securing weapons in the yard. There had not been any discussion of weapons, and he had not observed any injuries. The staff, however, always assumed there were weapons, and there was the possibility of a visual search every time there was a fight, even if there was no evidence of weapons. The inmates were aware that there could be a visual search whenever there was a fight.

FBI Special Agent Michael Kocher next testified his role was to investigate cases referred to him by the SIA for potential criminal prosecution. His investigation generally consisted of obtaining whatever information the SIS had. Not all "weapons" incidents were referred. Referral usually depended on the type of weapon any aggravating circumstances. When a case was referred, he would take it to the United States Attorney's office for an opinion. It was up to the United States Attorney to decide whether a case would be prosecuted. SA Kocher could not corroborate Lt. Montgomery's observation of the "suspicious" actions of Defendant and the other inmates, because he was not present during the incident and he had only viewed the video tapes of the incident after the fact. During his viewing of the tapes, he was not looking for anything specific. Even if he had been looking for suspicious activity on the tapes, he did not know that he could have seen what Defendant was doing, due to the distance from him to the cameras.

SIA Brian Antonelli testified next. He stated that on March 13, 2008, he responded to a call regarding a fight on the recreation yard. When he arrived at the scene, it looked "rather chaotic." Staff said that the "Bloods" had been "going at each other." He stood at the gate to identify each inmate as he exited after each was patted down. He was not sure which Bloods had been involved in the fight. The only connection he knew of between Defendant and the fight was that Defendant was a Blood. He saw Defendant and segregated him because he was a Blood. He told Defendant something to the effect of, "Come to the Lt's office. We want to talk to you," or "Oh, you might as well go right to the Lt.'s office." He then found out that Lt. Montgomery had already separated Defendant and the other three inmates. He was previously unaware that Lt. Montgomery had already separated out the four inmates.

The inmates had segregated themselves into groups along the fence. No one had told them where to stand. SIA Antonelli was not aware of anything suspicious found in the pat-down of Defendant. He only knew that Defendant was and had been a Blood since the Fall of 2007 and that this particular fight involved Bloods. There were six to ten Bloods, and he separated three or four others besides Defendant. The remaining Bloods that he did not separate were either victims in the fight, already removed, or he did not know at the time they were Bloods. He separated all the inmates he knew were Bloods, unless they had already been removed from the yard. A number of Bloods were already gone due to direct involvement in the fight. SIA Antonelli did not make the call to strip search the inmates, although he testified that he would have had Lt. Montgomery not already done so. He would have interviewed the inmates, checked them for injuries, and made sure all the participants in the fight were identified to avoid continuation or escalation of the incident. Inmates who were involved would be sent to the SHU to ensure no escalation.

7

SIA Antonelli testified that there were roughly 45 different gangs at USP Hazleton, including the Bloods, Crips, Surenos, Latin Kings, and MS-13's. There were numerous prior altercations at the facility.

A number of weapons were found after the fight – about four. They were found before Defendant was strip searched. The weapons were found before the inmates were separated. SIA Antonelli was aware of the weapons being found.

Defendant next testified. He was placed under oath. The undersigned then again advised him of his Constitutional rights; advised that if he took the stand and testified, he would be subjected to cross examination by the Assistant United States Attorney; advised that he had no obligation to take the stand and give testimony, and advised that if he gave incriminating testimony, it could be used against him in this or any other court of law. Defendant stated that it was his decision and he wanted to take the stand and testify. Thereupon, Defendant testified that on March 13, 2008 he was on the rec yard, when an argument started. He had tried to diffuse the argument , but it escalated to a fist fight and then weapons. Defendant had "stepped off" and left the area when the argument escalated. He was standing by the bathroom when the stabbing occurred, approximately 50 yards from the incident. There were perhaps 100 inmates in the area. When the fight broke out, the "tower" started "busting grenades." The inmates all knew what that meant. When Defendant heard the alarm he turned around and saw scuffling, heard the busting grenades, and got down on the ground. Everyone was on the ground. The inmates involved in the fight were handcuffed. The staff looked for weapons. The staff then told the inmates to get up and get pat searched. They did not find anything on him during the pat search. Everyone on his side of the yard was pat searched – 30 to 40 inmates. After the pat search, the inmates got on line and waited or "laid on the fence," and

8

waited to be checked in by Antonelli. Defendant congregated with "his circle," the Bloods. There were four or five of them together. No one was directed where to stand or separated out - - the inmates had gathered where they wanted. Lt. Montgomery, Defendant's case manager and his counselor were all "looking at him," so he put his hands up on the fence and looked at them. Other inmates were in front of him, but they were all "just standing how they wanted to stand."

Defendant testified that when he showed Antonelli his ID, Antonelli said, "I need to talk to you." Defendant replied that he would not talk to Antonelli without someone else with him, so he would not be called a snitch. Antonelli told him to bring whomever he wanted. Defendant went up to the lieutenant's office and waited. He testified that Antonelli came in and said he was going to view the videotape. Two other inmates were up there already. They were all Bloods. Five to six Bloods were not searched, but those inmates had all "just got there," having been at Hazleton only about a month, and were "brand new," according to Defendant.

Defendant testified that the others in his "circle" were strip searched. He confirmed that he was a Blood and that the fight was "Blood on Blood." He testified he did have a weapon hidden on his person, but he had not been worried, because he had not been involved in the fight. If he had been involved in the fight he would have been worried about having a weapon on him. He was not nervous during the pat down search because he knew the weapon was "concealed." It was "just an environment." He testified that if a weapon was found on an inmate, there were usually internal sanctions by the facility, such as taking away visiting or phone privileges, but they were usually not prosecuted outside the facility. He testified that "everybody keeps weapons" in the facility. There had been no opportunity for him to get rid of the weapon. He would have gotten rid of it, had there been an opportunity to do so.

9

## IV. Discussion

28 C.F.R. §552.11 provides, in pertinent part:

(c) Visual search--a visual inspection of all body surfaces and body cavities.

> (1) Staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred. For example, placement in a special housing unit (see 28 CFR part 541, subpart B), leaving the institution, or re-entry into an institution after contact with the public (after a community trip, court transfer, or after a "contact" visit in a visiting room) is sufficient to justify a visual search. The visual search shall be made in a manner designed to assure as much privacy to the inmate as practicable.
>
> (2) Staff of the same sex as the inmate shall make the search, except where circumstances are such that delay would mean the likely loss of contraband. Where staff of the opposite sex makes a visual search, staff shall document the reasons for the opposite sex search in the inmate's central file.

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." In <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court addressed the issue of whether visual body cavity searches of inmates after every contact visit violated the Fourth Amendment. First, the Court assumed without deciding that inmates retained some Fourth Amendment rights upon commitment to a corrections facility. The Court then held that the searches in that case were not unreasonable and therefore did not violate the Amendment. The Court first stated:

The test of reasonableness under the Fourth Amendment is not capable of precise

> definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Court must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted . . . . A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71-76, and in other cases . . . .

(internal citations omitted).

The Supreme Court then held that such searches must be conducted in a reasonable manner, and must not constitute "punishment." The Court concluded that, balancing the security interests of the institution against the privacy interest of the inmates, visual body cavity searches could be conducted on less than probable cause. Significantly, Bell concerned pre-trial detainees, and not inmates who had already been convicted of felonies, as is Defendant in this case. Certainly a pretrial detainee does not have lesser rights than a convicted felon inmate.

In fact, in Leverette v. Bell, 247 F.3d 160 (4th Cir. 2000), the Fourth Circuit held that a visual body cavity search of a prison employee did not violate her Fourth Amendment right against unreasonable search and seizure. In Leverette, a prison inmate informed the warden that other prisoners had schemed to buy marijuana, which Leverette would smuggle into the prison by concealing it in a tampon. The warden believed the inmate's information was reliable. It was decided that the warden would conduct a strip search of Leverette upon her arrival at work. The officers first searched Leverette's clothing and lunch container, but found nothing. They then conducted a visual body cavity search.

The Fourth Circuit cited Bell v. Wolfish, as "ma[king] clear" that the "unique security dangers" present in correctional facilities may justify even the most intrusive searches, and that

prisoners enjoy "severely abridged privacy interests." The court then found that, while a prison employee does not forfeit all privacy rights by accepting such employment, even an employee's expectations of privacy are diminished in light of the prison's manifest interest in preventing the introduction of drugs, weapons and other contraband. The Court then concluded that "prison authorities generally may conduct a visual body cavity search when they possess a reasonable and individualized suspicion that <u>an employee</u> is hiding contraband on his or her person." (Emphasis added). There is no such requirement of an individualized suspicion if the person searched is an inmate; the undersigned includes this case only to show the deference accorded the facility's decision, even where the person searched is an employee.

Finally, in an unpublished *per curiam* decision, the Fourth Circuit addressed whether a body cavity search of an inmate was constitutional. <u>Bushee v. Angelone</u>, 7 Fed. Appx. 182 (4th Cir. 2001).[2] The court, citing <u>Bell v. Wolfish</u>, <u>supra</u> held:

1. "Body cavity searches do not violate the Fourth Amendment if reasonable and not motivated by punitive intent."

2. "Courts gauge the reasonableness of a particular search by balancing the need for the search against the invasion of personal rights that the search entails. To this end, a court must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted."

Here, there was not a physical body cavity search of Defendant. Instead, Lt. Montgomery performed a strip search or visual search. Defendant stood naked in front of Lt. Montgomery and was directed to open his mouth, raise his arms, raise his testicles, etc. Defendant had tried to turn away from Lt. Montgomery and hide or even get rid of the object, but Lt. Montgomery saw the string

---

[2]Pursuant to Rule 36(a) of the United States Court of Appeals for the Fourth Circuit, a copy of <u>Bushee</u> is attached.

loop hanging from Defendant's testicles, and ordered him to throw the object down, which he did. Defendant does not argue that the manner or place of the search was unreasonable. Defendant stipulated that the manner and place of the search were reasonable. Notwithstanding the stipulation, the undersigned finds that the search was reasonably conducted. It was conducted in a room where the strip and search were private and not observable by others. It was conducted by Lt. Montgomery, a male on a male inmate. It was conducted without the touching of Defendant by Lt. Montgomery. It was not performed in an "abusive" manner.

Defendant does argue that the search was unreasonable because he was singled out for a search without reasonable objective suspicion. Therefore, the sole issue before the Court involves the "justification for initiating it (the search)."

Defendant argues that the search was not justified because there was no "reasonable suspicion" that he had concealed contraband on his body:

> They [the staff] did not have a legitimate factual basis on which to form a reasonable belief that contraband may be concealed on the defendant or that a good opportunity had occurred for contraband to be concealed on the defendant....Although there was an altercation on the day of the search, the defendant was not involved or in the immediate vicinity. The search was not part of a general shakedown of the inmates, and numerous other inmates were more proximate to the incident or connected to the participants, yet this defendant was singled out and searched, even after an initial pat down did not yield any contraband or reason for suspicion.

Counsel correctly argued at the hearing that the facts showed there were approximately 100 inmates on the yard during the incident. Even if only Bloods were searched, there were many more Bloods than just the three or four searched. Lt. Montgomery credibly testified, however, that he had decided Defendant would be searched, along with the unidentified inmate standing with him, and two of the four inmates standing in front of him, due to their "suspicious behavior." He testified that

13

Defendant and the other unidentified inmate were standing near the fence, with four other inmates standing between them and staff, forming what appeared to him to be "a barrier." His attention was at first drawn to the unidentified inmate, who was acting suspiciously and very nervous. He also noticed Defendant looking at him, looking at the ground, and the other inmates forming a barrier between the Defendant and him. He credibly testified that it was his own decision to conduct the searches and that he did not consult Antonelli.

Lt. Montgomery's testimony is corroborated by that of SIA Antonelli, who testified that he did not make the call to strip search the inmates, and was unaware when he told Defendant to go to the lieutenant's office, that Lt. Montgomery had already done so.

Lt. Montgomery's testimony was also corroborated by Defendant himself, who testified that he was congregating with "his circle," the Bloods, at the fence. There were four or five of them together, "like they said." Montgomery, a counselor, and his case manager were "looking at him" so he looked at them. "Dudes" were standing in front of him– just in a line– standing "how they wanted to stand." Others in "the circle" were also strip searched.

Whether or not Lt. Montgomery's suspicions regarding the six inmates were correct, the undersigned finds he was justified in conducting the strip search of Defendant. He had a reasonable belief, based on his own observations of Defendant, that he may have had contraband concealed on his person. He knew from experience that pat-down searches did not always reveal concealed contraband. There is simply no evidence that Lt. Montgomery had "singled out" Defendant for any other reason than his suspicious behavior.

The credible testimony indicates that SIA Antonelli had also independently separated several inmates, including Defendant, for further investigation. He did so, however, because he knew the

14

fight had been "Blood on Blood," and knew for a fact that Defendant was a Blood. He singled those inmates out that he knew were Bloods. There were some Bloods not included, but they had either been taken away already due to their direct involvement in the fight, or Antonelli simply did not know they were Bloods. As Defendant himself testified, all four of the inmates "singled out" were Bloods. He noted there were four or five Bloods who were not searched, but they had "just got there" about a month earlier, and were "brand new." It is therefore credible that Antonelli had not identified them as Bloods.

The undersigned finds that it was ultimately Lt. Montgomery who separated out the four inmates, including Defendant, to be strip searched. He had not consulted with Antonelli. Defendant has made no credible assertion that the search by Montgomery was conducted for any other reason than concern for institutional security and safety. There is no evidence, and no inference can be drawn from the testimony or other facts that the search was conducted to harass, humiliate or punish Defendant. Lt. Montgomery's stated justification for conducting the strip search was supported by the evidence.

Even if Antonelli had separated out Defendant, he had not ordered the strip search. Further, he had justification, independent of Montgomery's, for singling out the four Bloods. The fight was "Blood on Blood," he knew the four were Bloods, and any other Bloods who had been in the area were either unknown to him or had already been removed from the area. Again, Defendant has made no credible assertion that the search, even if directed by Antonelli, was conducted for any other reason than concern for institutional security and safety. There is no evidence, and no inference can be drawn from the testimony or other facts that the search was conducted to harass, humiliate or punish Defendant. SIA Antonelli's stated justification for separating out Defendant and the others

15

for further investigation was supported by the evidence.

There are approximately 45 gangs identified at USP Hazleton, including some well-known for violence. There had been a fight, involving weapons, in the recreation yard. Inmates were injured in the fight. There was a stabbing. The fight involved members of the Bloods gang. A number of weapons (about four) were found stuck in the ground in the yard after the fight was broken up. Defendant himself testified that "everybody" at USP Hazleton kept weapons. He admitted he himself had a weapon concealed on his person. He was not afraid of the pat-down search because he knew the weapon was concealed so that it would not be discovered during a pat-down. There had been numerous prior altercations at the facility, and a number involved the Bloods. Defendant was "laying on the fence" along with other members of the Bloods, after the fight and pat-down. Other inmates were in front of him, between himself and Lt. Montgomery. Lt. Montgomery and other staff were looking at him, so he looked back at them.

Upon consideration of all which, the undersigned finds in view of the case law cited above that the strip search of Defendant was reasonable and not motivated by punitive intent. The search therefore did not violate Defendant's "severely abridged privacy interests" under the Fourth Amendment.

Inasmuch as an order denying defendant's motion to suppress may be tantamount to a dispositive motion, it is the **RECOMMENDATION** of the undersigned Magistrate Judge that defendant's motion to suppress [Docket Entry 10] be **DENIED.**

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 29th day of July, 2008

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE